FRANKLAND RACING EQUIPMENT, INCORPORATED, ET AL., 1 Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Frankland Racing Equipment, Inc. v. CommissionerDocket Nos. 5523-80, 9509-80, 4661-81, 4662-81, 29106-81, 29107-81.United States Tax CourtT.C. Memo 1987-210; 1987 Tax Ct. Memo LEXIS 206; 53 T.C.M. (CCH) 658; T.C.M. (RIA) 87210; April 27, 1987. Robert S. Bolt and Geoffrey T. Hodges, for the petitioners. Willie Fortenberry, for the respondent. HAMBLENMEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax and determined additions to tax pursuant to section 6653(b) 2 as follows: TaxableAddition to TaxYearDeficiencySec. 6653(b)Frankland Racing Equipment Inc.Docket Nos. 5523-80,4662-81, and 29106-817-31-72$46,779.97$23,389.997-31-73117,610.3258,805.167-31-74130,016.89100,425.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,905.5234,452.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,351.6021,175.807-31-777,113.003,557.007-31-78973.00486.00James Frankland, Jr.Docket Nos. 9509-80,4661-81 29107-8112-31-72$45,557.48$22,778.7412-31-73112,891.8856,445.9412-31-7496,430.8648,215.4312-31-7582,776.6941,388.3412-31-7615,904.427,952.2112-31-779,480.004,740.00*208 Respondent within the amendment to answer asserts that section 6214(a) provides the Tax Court jurisdiction to determine whether increased additions to tax pursuant to section 6653(b) should be assessed for the taxable years 1972 and 1973 of petitioner James Frankland, Jr., in the respective additional amounts of $8,987.04 and $25,401.40. Respondent asserts that petitioner James Frankland, Jr., filed a fraudulent amended Federal income tax return for each of the taxable years 1972 and 1973 and that the asserted increased additions to tax within the amendment to answer for such years are computed on the net increase of tax reported on such amended Federal income tax returns. 3*209 The primary issues presented for our determination concern whether the fraudulent acts of petitioner James Frankland, Jr., ("Frankland") in concert with certain other employees of petitioner Frankland Racing Equipment, Incorporated (hereinafter referred to as "the Corporation" or "Frankland Racing"), designed to divert gross receipts of Frankland Racing for individual benefit constitute gross income of Frankland Racing and, if so, the amount thereof and whether such fraudulent acts of Frankland are attributed to Frankland Racing for purposes of the addition to tax provisions of section 6653(b). Furthermore, we must determine the amount of constructive dividend income received by Frankland in the form of diverted gross receipts of Frankland Racing during each year in issue and determine whether the underpayment of tax, if any, pertaining to the taxable year 1977 of Frankland is due to fraud within the meaning of section 6653(b). Frankland concedes the receipt of diverted gross receipts of Frankland Racing and the existence of fraud pertaining to such receipt for the taxable years 1972 through 1976 thereby restricting our inquiry as to such years to the determination of the amount*210 of diverted gross receipts of Frankland Racing so received by Frankland. The subsidiary issues presented for our determination are: (1) whether Frankland Racing is entitled to deduct as embezzlement losses certain gross receipts diverted by Frankland and other employees during the taxable years July 31, 1972, through July 31, 1978; (2) whether Frankland Racing is entitled to deduct certain payments designated as officer compensation to Frankland and his spouse, Louise Frankland; (3) whether Frankland Racing is entitled to deduct certain professional fees; and (4) whether the statute of limitations on assessment and collection operates to foreclose the assessment of Federal income tax as to Frankland Racing for the taxable years July 31, 1972, through July 31, 1976, and as to Frankland for the taxable years 1972 through 1976. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of facts and attached exhibits are incorporated herein by this reference. At the time of the filing of the petitions herein, Frankland resided in Riverview, Hillsborough County, Florida. Frankland Racing is a Florida corporation, which at the time of filing*211 of the petitions herein had its place of business at Ruskin, Hillsborough County, Florida. Frankland Racing's fiscal and taxable years ended on July 31. Frankland Racing reported income and deductions on the accrual basis method of accounting and filed Federal income tax returns for the taxable years ended July 31, 1972, July 31, 1973, July 31, 1974, July 31, 1975, July 31, 1976, July 31, 1977, and July 31, 1978, on August 24, 1972, January 14, 1974, April 16, 1975, October 28, 1975, January 18, 1977, September 26, 1978, and January 9, 1979, respectively. The Corporation filed amended Federal income tax returns for fiscal years ended July 31, 1972, and July 31, 1973, filed on September 12, 1975, and September 22, 1975, respectively. Frankland filed his Federal income tax returns, using the cash method of accounting, for the calendar years 1972, 1973, 1974, 1975, 1976, and 1977. Frankland and Louise Frankland filed joint Federal income tax returns for the years 1972, 1973, 1974, 1975, and 1976. Respondent determined that Louise Frankland was relieved of liability for such years as an innocent spouse within the meaning of section 6013(e). On April 7, 1970, Frankland and Louise*212 Frankland entered into an "AGREEMENT OF AND BETWEEN JAMES FRANKLAND, JR. AND WIFE LOUISE FRANKLAND PRESENTLY RESIDING IN RUSKIN, FLA." ("the Agreement"). The Agreement was prepared by Earl Myers ("Myers"), the brother-in-law of Louise Frankland. Myers was not an attorney but he was familiar with the Frankland's marital difficulties. The Agreement was intended to provide Louise Frankland financial and marital security. Louise Frankland understood that she had the right to acquire 4,100 of Frankland's 4,500 shares. The pertinent parts of the Agreement are as follows: I, JAMES FRANKLAND JR, BEING OF TRUE AND SOUND MIND AND WITHOUT ANY OTHER INFLUENCE OR FEAR DESIRE TO DO THE FOLLOWING: (ALL REFERENCES TO STOCK AND CORPORATION IN THIS DOCUMENT MEANS [sic] THE FRANKLIN [sic] RACING EQUIPMENT INC FORMED 1969) PRESENT HOLDINGSJAMES FRANKLAND JR.4,500 SHARESLOUISE FRANKLAND490 SHARESKENNETH L MCELWAIN10 SHARESTO CONVEY TO MY TWO DAUGHTERS AND ONE SON BY MY FORMER MARRIGE [sic] A TOTAL OF 300 SHARES FROM MY HOLDINGS EQUALLY DIVIDED 100 SHARES TO JANET, 100 SHARE [sic] TO JUDY, 100 SHARE [sic] TO JAMIE WITH NO FURTHER RECOURSE OF EACH OR EITHER*213 OF THEM AS TO ANY OF MY OTHER PERSONAL ESTATE IN EITHER CASH OR PROPERTY. * * * FURTHER I WISH TO CONVEY TO MY FAITHFUL EMPLOYEE KENNETH L MCELWAIN 100 SHARES OF MY PRESENT HOLDINGS. THE REMAINING 4,100 SHARES ARE OFFERED AND MAY BECOME THE PROPERTY OF LOUISE FRANKLAND ON AN OPTION PURCHASE BASIS OF ORIGINAL ISSUE VALUE OF $1.00 PER SHARE, WITH THE UNDERSTANDING THAT 1,000 OF THESE SHARES SHALL BE CONVEYED TO OUR SON TONY [THEN AGE 7] FREE AND CLEAR WHEN REACHING THE LEGAL AGE OF 21, OR IMMEDIATELY IF MY WIFE LOUISE SHOULD MARRY IN CASE OF MY PASSING AWAY BEFORE SHE. IN THE EVENT OF MY DEATH IT IS MY DESIRE THAT LOUISE FRANKLAND BECOME PRESIDENT OF THE CORPORATION AND SHE MAY NAME ANYONE SHE SO DESIRES TO BECOME VICE PRESIDENT. IT WOULD THEN BE MY DESIRE THAT KENNETH L MCELWAIN, REMAIN AS SECRETARY AND BE PROMOTED TO GENERAL MANAGER AND THAT HE BE GIVEN AN ADDITIONAL 1,000 SHARES OF STOCK FROM THE STOCK UNISSUID [sic] AND HELD IN THE TREASURY. IN THE MEANTIME IF IT SHOULD BECOME NECESSARY TO ISSUE THE 5,000 SHARES HELD IN THE TREASURY, UNISSUED, THIS STOCK MAY ONLY BE ISSUED IN THE SAME MANNER AND PORPORTION [sic] AS THE ORIGINAL ISSUE OF 5,000 SHARES AND THE DISTRIBUTION*214 SHALL BE IN THE SAME MANNER AS OUTLINED FOR THE ORIGINAL ISSUE OF 5,000 SHARES. * * * I JAMES FRANKLAND AGREE NOT TO FORM ANY OTHER CORPORATION COMPANY OR ENTERPRIZE [sic] WITHOUT FIRST CONSULTING MY WIFE LOUISE AND SECURE HER APPROVAL. * * * IT IS ALSO MY DESIRE, THAT IN EVENT BOTH OF US SHOULD PASS AWAY AT OR NEAR THE SAME TIME, THAT BEATRICE S MYERS BE NAMED LEGAL GUARDIAN OF OUR SON TONY AND HANDLE ALL HIS FINANCIAL AND BUSINESS AFFAIRS UNTIL HE REACHES THE LEGAL AGE OF 21. * * * IT IS FURTHER AGREED THAT LOUISE FRANKLIN [sic] SHALL BE PLACED ON THE CORPORATE PAYROLL AT A SALARY OF $200.00 WEEKLY FOR ANY DUTIES SHE MAY PERFORM AND FOR BEING VICE PRESIDENT. THE SALARY SHALL BE RETROACTIVE TO JAN 1 1970 AND HER SHARE OF SOCIAL SECURITY TAX SHALL BE DEDUCTED FROM THIS PAYMENT AND THE CORPORATION TO PAY THEIR SHARE. JAMES FRANKLAND JR TO RECEIVE A SALARY OF $2,000.00 MONTHLY AND IN EVENT THERE BE ANY CHANGE IN THIS FIGURE EITHER UPWARD OR DOWNWARD, THE SALARY OF LOUISE FRANKLIN [sic] SHALL BE ADJUSTED IN THE SAME PORPORTION [sic]. * * * Frankland Racing was formed on July 29, 1969. At all times relevant to this case, Frankland Racing has been engaged in*215 the manufacture and sale of certain parts for racing cars. Frankland Racing has wholesale and retail customers. Since the time of incorporation and at all times relevant to this proceeding, the stock certificates for the outstanding stock of Frankland Racing have been issued in the names of the following persons and in the following shares: ShareholdersNumber of SharesFrankland4,500Louise Frankland490Kenneth McElwain10Since the time of incorporation and at all times relevant to this proceeding, the Board of Directors and the officers of the Corporation have been: FranklandPresident and DirectorLouise FranklandVice-President and DirectorKenneth McElwainSecretary/Treasurer andDirectorFrankland Racing first occupied its current place of business on or about December 8, 1964. The business was founded by Frankland and Frankland's father, James Frankland, who died in 1954. Frankland has worked continuously full time in the business since 1946. Frankland Racing's principal products were the "Quick Change Center Section" and the "Quick Change Racing Axle." These products are also referred to in the racing car*216 industry as "rear ends." The manufacturing of a rear end involves purchasing unfinished castings from various suppliers; machining the castings to detailed specifications; inspecting, cleaning and washing the machined castings; heating the castings, adding drilling and tapping rings, pinions, side bells, tubes and other parts to the castings; washing the finished casting again; bolting the finished castings together into a rear end; testing the specifications of the rear end; and then shipping the completed rear end to a customer. In addition to rear ends, Frankland Racing also manufactured separate race car rear axles, front ends, brakes, rotors, drive flanges, hubs, quick change gears, lug bolts, and special tools necessary to replace Frankland Racing's "quick-change" rear ends. The Corporation also performs specialty machine work on occasion for particular customers. The only significant change in the products manufactured by Frankland Racing since 1969 has been a gradual phase-out of a style of front end that became obsolete in the racing industry. Beginning in 1948 and continuing through 1978, Frankland Racing's principal products and many of their components were initially*217 designed by Frankland. At the time of their design, these products were novel in the racing industry, in that they enabled a driver, during a race, to change gear ratios to adapt to changing track conditions. As a result of these designs, Frankland and Frankland Racing became nationally known and respected in the racing industry. From prior to incorporation through 1978, the key employee positions of Frankland Racing, the individuals occupying those positions, and the dates of employment of those individuals were as follows: PositionEmployeeDates of EmploymentChief ExecutiveFranklandAll timesGeneral Manager,Ken SickelsAll timesSales Manager,("Sickels")Purchasing AgentOffice Manager,Audrey McKenzieAll times untilExecutive Secretary("McKenzie")3/24/78 4Shop Manager,Kenneth McElwainAll times untilOfficer, Director("McElwain")1/19/73Shop ManagerHarold Suter11/5/73 until after("Suter")1978 5Draftsman, DataRobin KnowlesAll times untilProcessor,("Knowles")7/28/72Purchasing Agent,PlannerChief BookkeeperPaul SullivanAll times until4/1/71BookkeeperDavid Ashley4/9/71 until 8/4/72BookkeeperFrank Frament9/15/72 until after1978*218 Frankland's day-to-day activities at the Corporation's place of business included reviewing incoming bills, correspondence, and customer payments; reading trade magazines and making general suggestions to the key employees based on ideas gleaned from those magazines; and monitoring the machine shop production scheduling and output through production orders posted to a board in the front office. Frankland delegated authority to legally bind the Corporation in buying and selling to Sickels and McKenzie, and he delegated check signing authority to the bookkeeper. Sickels was in charge of the sales operations of the Corporation. In addition to his responsibilities specifically described elsewhere, Sickels took orders from customers over the telephone and completed related papers, such as assembly orders, and handled anywhere between 60 percent to 90 percent of all incoming calls to the Corporation for this purpose during*219 the years at issue. Other sales activities by Sickels included establishing and visiting distributorships around the country. Sickels also acted as general manager of the Corporation. As general manager, Sickels hired employees, negotiated with customers to set prices, credit and delivery terms, arranged to pay "contingency money" if the Corporation's products were used in races, authorized the purchase of supplies used in manufacturing, dealt with the suppliers, and handled advertising. In addition to her duties specifically described elsewhere, as office manager, McKenzie authorized purchases of castings and other parts. She took telephone sales orders and completed purchase orders. Prior to terminating his employment on January 19, 1973, McElwain was the production manager in charge of the Corporation's machine shop. As such, he was responsible for manufacturing the Corporation's products as described above, maintaining quality control for the Corporation, and supervising the employees in manufacturing, assembling, and shipping. Prior to terminating his employment on July 28, 1972, Knowles was responsible for purchasing the Corporation's supplies, making engineering*220 and graphical drawings, preparing the catalog of the Corporation's products, operating the Corporation's computer programming and data processing functions, general ledger accounting, disbursing funds or accounts payable to vendors, controlling the accounts receivable of the Corporation, and sales and production forecasting. The Corporation employed full-time bookkeepers who were responsible for maintaining its books and records of account. Frankland and the Corporation engaged independent accountants for purposes of completing their Federal tax returns and financial statements. In preparing these documents, the accountants relied on figures supplied by the Corporation's bookkeepers. Such bookkeepers were not aware that certain employees of the Corporation diverted gross receipts. All of the Federal income tax returns relating to years before this Court were prepared, signed and filed by those accountants. Approximately 97 percent of all orders received from the Corporation's customers are placed by telephone. Approximately two percent are placed by written orders and one percent are walk-in customers at the Corporation's place of business. Each year the Corporation mails a*221 catalog to its customers containing a detailed listing of the parts manufactured by the Corporation and the information necessary to place orders by telephone. The normal bookkeeping procedure of the Corporation was as follows: Generally, when a customer called to order parts, Sickels or McKenzie would answer the telephone and would write the order on a two-page document (one white, one green) called an "assembly order". The assembly order would be hand-carried to the assembly and shipping department, which would prepare the order for shipping to the customer, if the ordered parts were stocked in inventory. If the parts were not stocked in inventory, the assembly order would be hung on the wall in the front office to be processed later by the machine shop, which would produce the parts ordered. After the parts were manufactured, they would be prepared for shipping. After preparation of the order for shipping, Sickels would hand-carry the assembly order to the front office, where either McKenzie or a secretary under her supervision would prepare a formal invoice from the information on the assembly order. Sickels would set the price of the part to be shipped. The invoice was*222 a four-page document which bore the numbers of the parts ordered, the quantity ordered, and the price. Invoices were prepared for all sales that took place during the normal course of the Corporation's business. One page of the invoice was placed in the shipping carton, one copy was used by the bookkeeper as the customer's billing statement, one copy was placed in the customer's permanent file, and one copy was used by the bookkeeper for recording in the sales journal. Payments made by customers who received invoices were recorded in the cash receipts journal. Generally, payments for invoiced sales were processed as follows: Over 95 percent of the payments were received in the form of checks from the customers made payable to the Corporation that were sent by mail. Currency was occasionally received from walk-in customers. Unless McKenzie was absent from work, she would pick up the Corporation's mail each morning at the post office, sort the mail, and route the customer payments, bills, and correspondence to Frankland who would then route the payments to the bookkeeper for recording in the cash receipts journal and depositing in the Corporation's bank accounts. Except for walk-in*223 customers that accounted for approximately one percent of the Corporation's business, with regard to sales reported in the Corporation's books, the Corporation did not as a business practice deal in cash. The normal business practice of the Corporation was to forward any cash received to the bookkeeper for recording, and a confirming invoice was prepared. For approximately two years commencing in the year 1970, Frankland Racing utilized a computer recording process to record sales and accounts receivables. The computer would produce an original invoice and the amount the customer owed the Corporation. The Corporation reverted to a manual system to record sales and accounts receivable approximately during the year 1972. According to Frankland, Sickels, and McKenzie, the misappropriation scheme ("the scheme") described hereafter was primarily established because of Frankland's marital problems and the ownership consequences of the Agreement with Louise Frankland. As Sickels saw it, the scheme circumvented and "short-circuited" the normal business practices of the Corporation. The only active participants in the scheme were Frankland, Sickels, and McKenzie. The scheme was confidential*224 and not publicized to other employees. At the direction of Frankland, McKenzie kept monthly records of diverted sales, known as "recap sheets," described below, which recorded diverted sales of inventory for which no formal corporate invoices were issued for the period covered by the recap sheets. McKenzie was responsible to reconcile the incoming payments attributable to the scheme to the recap sheets. The recap sheets indicated that diverted sales related to the scheme began in September of 1971. McKenzie did not prepare recap sheets after February of 1976. McKenzie was entrusted by Frankland to maintain a monthly record of all diverted sales for which formal invoices were not prepared and therefore that were not reported to the bookkeeper. The information to record diverted sales was taken from the assembly orders used to process the unreported sales. McKenzie kept the recap sheets in the trunk of her car, however, she prepared the recap sheets in Frankland's office. When she picked up the mail at the Post Office each morning, McKenzie checked it for receipt of diverted gross receipts by comparing it with the recap sheets. She separated the funds which were to be misappropriated*225 and recorded on the recap sheets. Frankland instructed McKenzie to destroy the monthly recap sheets when all payments for each month had been received. Frankland was unaware that McKenzie had been keeping the recap sheets longer than was necessary to verify the payments received as unreported sales. McKenzie kept the recap sheets for sales that took place from September of 1971 through February of 1976. McKenzie did not discuss the recap sheets with anyone other than Frankland. The recap sheets were not disclosed to the other employees. When respondent's examination began in late 1975, Frankland told Sickels and McKenzie to destroy any records of diverted sales. McKenzie did not destroy the recap sheets but instead kept them and some other records. Ultimately, McKenzie gave the recap sheets and her other records of the scheme to her attorney. McKenzie maintained a black notebook to record her compensation as a participant in the scheme. Frankland determined the amount of compensation paid to McKenzie and Sickels to be 10 percent of the diverted amount of any sale. Subsequent to respondent's investigation, Frankland paid McKenzie and Sickels an amount of currency determined*226 at will. McElwain and Suter received diverted funds but were not aware of the scheme. When McKenzie made her first currency collection, Sickels asked for the cash. McKenzie refused to give Sickels the cash and instead went to Frankland's office. Frankland accepted the assembly order, the cash, and slipped some of the money into McKenzie's hand. At the time McKenzie received her first currency payment on behalf of the Corporation in 1971, the normal business practice of Frankland Racing was that the currency should have been routed to bookkeeping and the assembly order should have been given to a clerk to type a formal invoice. After McKenzie's encounter with Frankland regarding her first currency receipt, she became aware that all corporate gross receipts were not processed through the bookkeeping system of the Corporation. McKenzie had become a participant in the scheme. There was a slight difference in procedures used to divert sales pursuant to the scheme. If the sales were going to be recorded on the corporate books and were initiated by telephone, walk-in or mail customers, the assembly order went back to shipping, the order was written down, the shipping clerk marked*227 what was going to be shipped, the item was brought back up to the front office, priced and indexed, handed to a clerical employee, typed out and the original was mailed to the customer. Moreover, a permanent copy of the order went into bookkeeping, one part of the order went into the file in the front office, and one part of the order was used as a shipping and packing slip. When the sales were not going to be reported on the corporate books, the preparation of the assembly and shipping was the same but when the order came back up front there was no formal invoice typed up. The green copy of the assembly order was used as a packing slip or it was given to the customers. The assembly order was held and then it was posted on the recap sheets kept by McKenzie. If an order was received from a customer to whom diverted inventory was to be sold ("a participating customer"), Sickels would take the order and deliver the assembly order to McKenzie after the order was filled. McKenzie would either mail the white copy of the assembly order to the participating customer or place it in the carton to be shipped. No invoice was prepared for sales associated with the scheme. No record of the*228 sale would ever be made on the corporate books, since absent an invoice, the bookkeeper would not learn of the order. Upon opening the mail each day, McKenzie sorted the mail and segregated the customer payments to be reported from those associated with the scheme and delivered the mail as segregated to Frankland. Frankland generally deposited the unreported sales proceeds into a bank account that he maintained at the Sun City Center Bank, in Sun City Center, Florida. However, Frankland cashed checks he received at the First Bank of Ruskin, in Ruskin, Florida, and Frankland deposited the funds he received in an account he maintained at the Barnett Bank of Brandon in Brandon, Florida, or the Bank of Riverview in Riverview, Florida. None of those deposits were reported by Frankland or Frankland Racing within their Federal income tax returns as originally filed. Participating customers were selected because they were well-known to Sickels, and they generally were the larger customers of the Corporation who repeatedly purchased goods on a "revolving account." Participating customers paid for sales pursuant to the scheme in currency, check, certified check payable in blank, or to*229 the order of Frankland personally. Participating customers received an additional 10 percent discount over and above the normal discounts offered to distributors or jobbers. All discounts offered to participating customers who paid cash or by checks issued in blank or to the order of Frankland personally are noted on the recap sheets for the periods covered by the recap sheets. The recap sheets show that the 10 percent discount was first offered in March of 1972 and thereafter offered in each month covered by the recap sheets through February of 1976. Participating customers were told by Sickels that Frankland was having marital problems, that he did not want his wife to know about the currency or personal checks, and that he was trying to keep those monies from his wife. Currency paid by participating customers was physically delivered by the customer to either McKenzie or Sickels. Sickels frequently travelled to the customers' places of business, or met the participating customers at their local airports and received currency payments. Some participating customers received both formal invoices, relating to reported sales, properly recorded by Frankland Racing, and assembly*230 orders or informal statements, relating to the scheme. The formal invoices were on the Corporation's letterhead, typed, with invoice numbers and amounts charged and credited, and, upon receipt of a formal invoice, the participating customer would issue a check payable to the Corporation. When the participating customers received assembly orders and informal statements, typed on plain white paper (frequently handwritten with no invoice numbers), payment would be tendered either by currency or check issued in blank or payable to the order of Frankland personally. An informal statement was sent to a participating customer to inform the respective customer that goods had been purchased at a discount. Frankland may not have received the money the moment McKenzie made her entry on the recap sheets due to timing considerations concerning collection of the revolving accounts of large participating customers, but Frankland received all amounts listed on the recap sheets for the period covered by them. On the average walk-in cash sale Frankland received the money that day. As to the larger volume accounts, Frankland would have received the money within approximately two months. McKenzie*231 designated payments of revolving accounts by participating customers on the recap sheets by the notations "paid", "pd.", "*", or circled. McKenzie also kept informal statements regarding large volume customers on revolving accounts to detail the recap sheets designations "paid", "pd.", "*", or circled. Raceway Speed Center is an example of one of the large customers kept on a revolving account. The informal statements concerning Raceway Speed Center's revolving account were just a sample of the numerous documents that backed up the recap sheets. Some examples of large customers on revolving accounts were S & S Auto Supply in Louisville, Kentucky, Raceway Speed Center in New Jersey, L & R Speed Shop, L. W. Funk Auto Parts in Orlando, Florida, Bob Luscomb in Orlando, Florida, Kendricks Recreation, Louis Radney, Will Cagle, Ollie Silva, Buzzy Reutimann, and Triangle Automotive in Tampa, Florida. Lester W. Funk ("Funk") doing business as L. W. Funk Auto Parts became a distributor of Frankland Racing around 1971. When Funk first became affiliated with Frankland Racing, he paid for items mostly by check until the year 1974. After 1974, Funk paid Frankland Racing by check and sometimes*232 by currency. Funk received a 10 percent discount for paying his bill in currency. Sickels approached Funk regarding the payment of currency. Sickels explained to Funk that Frankland desired currency due to Frankland's marital problems. Cliff Dwyer ("Dwyer") was employed with Raceway Speed Center in Bordentown, New Jersey, from 1969 to 1976. Dwyer was employed as president of the corporation from 1969 to 1976. The forms of payments at Raceway Speed Center made to Frankland Racing were checks and currency. Raceway Speed Center began to do business with Frankland Racing approximately the year 1973. When Raceway Speed Center first started purchasing parts from Frankland Racing, Raceway Speed Center received a formal typewritten bill. Frankland Racing's billing system changed from a formal bill to an informal bill. At one point, Raceway Speed Center was receiving both a formal bill and an informal bill. The formal bill sent by Frankland Racing to Raceway Speed Center was written on a regular letterhead statement with invoice numbers and amounts charged and credited to the account. The informal statement was written on a plain sheet of white paper, handwritten. The informal statement*233 had no invoice numbers that was mailed to Raceway Speed Center. Raceway Speed Center paid the informal statement by certified checks or in currency. Raceway Speed Center made the checks out to Frankland Racing Engineering, Inc., in payment of the formal bill. When Raceway Speed Center paid by currency or certified check, it received a 10 percent discount. Raceway Speed Center did not receive a 10 percent discount when checks were made out in the name of Frankland Racing Engineering or Frankland Racing Equipment, Inc. Raceway Speed Center received an informal bill from Frankland Racing from sometime in 1974 to at least sometime in 1976 when Dwyer left the corporation. The reason Sickels gave Raceway Speed Center for wanting to have the checks or payments in either cash or cashier's checks payable to Frankland was due to the fact that Frankland was having marital problems and was trying to keep some money from his wife. David W. Anderson ("Anderson") of Andy's Speed Supply began to purchase parts from Frankland Racing during the early part of 1970's. Subsequent to beginning business with Frankland Racing, Anderson would leave checks with the payee's name in blank. However, when*234 he received the cancelled checks back, the name that would either be written or stamped in would be Frankland, J. Frankland, Jim Frankland, or James Frankland. S & S Auto Supply started doing business with Frankland Racing sometime approximately during the year 1970. Sickels came to S & S Auto Supply in Kentucky for the purpose of collecting currency payments owed to Frankland Racing by S & S Auto Supply. When S & S Auto Supply started doing business with Frankland Racing payments were in the form of checks. During the year 1973, S & S Auto Supply began paying Frankland in currency as a participating customer. S & S Auto Supply received the customary 10 percent discount for currency payment. Respondent's agents determined the amount of cash that McKenzie and Sickels received from Frankland for their participation in the scheme and allowed Frankland a deduction for such amount in each of the taxable years 1972 through 1975. The record is devoid of any reliable evidence to establish that McKenzie and Sickels diverted gross receipts without the participation and knowledge of Frankland. The recap sheets indicate that the amount of $943,872.44 was diverted pursuant to the scheme*235 during the period of September of 1971 until February of 1976. To test the accuracy of the recap sheets, respondent's agents identified third party contacts of participating customers on the recap sheets to verify the recap sheets as being authentic records. The result of the agents' contacts indicated that the entire sample was accurate. Respondent identified participating customers and verified the accuracy of the recap sheets as reconciled without error to the extent of $646,820.33. The total amount of diverted sales shown on the recap sheets that were marked "paid", "pd.", "*", or circled was the amount of $501,162.11. Respondent verified the amount of $491,945.48 designated as "paid", "pd.", "*", or circled by third party contact of participating customers. Respondent traced the amount of $401,017.34 paid by participating customers during the period covered by the recap sheets through the bank collection system. Respondent's agents determined that it was impractical to verify every entry on the recap sheets. There were 548 customers on the recap sheets. Respondent's agents did not have the resources to identify all the people involved in the recap sheets, the reason being, *236 that for cash sales, respondent would have no way of knowing who the cash sales represented, and would have no means of locating the cash purchasers. Respondent's agents requested of various customers of Frankland Racing all the payments that were made to Frankland or Frankland Racing during the periods at issue and, after respondent's agents received such amounts and dates, they went back and compared them to the recap sheets. Respondent's agents, contacted in excess of 100 customers of Frankland Racing and determined that the recap sheets kept by McKenzie at the direction of Frankland were accurate. Respondent's agents verified the amounts received by Frankland from analyzing bank accounts, the corporate sales receipts Frankland cashed, and through interviews with Sickels and McKenzie. The recap sheets included sales of Frankland Racing that were paid in currency, checks made payable to James Frankland which he endorsed and cashed, checks payable to Frankland Racing which Frankland endorsed and deposited into his personal account, cashier checks, money orders, and postal money orders. Respondent's agents determined the amount Frankland paid employees of Frankland Racing through*237 the Sun City Center Bank account. Harry Scherwinski ("Scherwinski") prepared the Corporation's income tax returns for fiscal years ended July 31, 1972, and July 31, 1973. Scherwinski relied on the books and records of the Corporation maintained by the bookkeeper to prepare the returns. Frankland was aware that the Corporation's income tax returns were fraudulent because such returns were prepared from the bookkeeping records which did not include diverted sales. It was customary for the accounting firm which employed Scherwinski to review orally the return, the amount of the taxable income, and the method of payment with the top officer of the corporation, and in this case it would have been the president of the corporation, that being Frankland. Frankland hired attorney David Maney ("Maney") regarding the dissolution of his marriage to Louise Frankland and the legal consequences of the Agreement. Frankland informed Maney of the scheme and the Sun City Center Bank account. Maney also represented Frankland in the criminal matters relating to the scheme. Maney employed Leonard M. Anton, C.P.A. ("Anton"), for the purpose of rendering tax advice regarding the scheme. Frankland*238 paid Maney on January 24, 1975, to commence the marriage dissolution proceedings and to commence with efforts to prepare amended Federal tax returns for the Corporation and for himself so as to report the Sun City Center Bank deposits. Maney paid Anton the amount of $10,000 to prepare the corporate and individual amended Federal income tax returns on behalf of Frankland Racing and Frankland. The Corporation deducted the amount of $10,000 as a professional fee on its July 31, 1975, Federal income tax return regarding such payment. Anton prepared the amended corporate returns for years ending July 31, 1972, and July 31, 1973. According to Anton, the amended returns for the two fiscal periods ending July 31, 1972, and July 31, 1973, were prompted because there were corporate funds being deposited into a second bank account that were not reflected on the books and records or were not given consideration on the original tax returns of the Corporation for the periods ending July 31, 1972, and July 31, 1973. The second bank account was the personal bank account of Frankland at the Sun City Center Bank. The reporting of the Sun City Center Bank account was due to respondent's investigation. *239 The Corporation's amended Federal income tax returns for the fiscal periods ending July 31, 1972, and July 31, 1973, filed in the year 1975 report as deductible officer compensation to Frankland the respective amounts of $90,200 and $87,377.38. For fiscal periods ending July 31, 1973, and July 31, 1974, Frankland Racing reported on its books and records that Frankland earned a salary of $34,780.00 and $36,892.90, respectively. Anton, at the time he was preparing the amended tax returns for fiscal periods ending July 31, 1972 and 1973, asked Frankland whether or not he had additional income other than the amounts stated or set forth in the Sun City Center Bank. Frankland advised Anton that the Sun City Bank account was all the diverted corporate income. Frankland failed to tell Anton about personal accounts other than the Sun City Bank account, namely, a personal bank account he had at the Barnett Bank of Brandon and a personal bank account he had at the Bank of Riverview, or the checks cashed as First Ruskin Bank. Anton prepared the original corporate returns for fiscal periods ending July 31, 1974 and 1975, from the information contained in the books and records of the Corporation*240 together with whatever deposits or whatever financial activity flowed through the Sun City Center Bank. For the years ending July 31, 1974 and 1975, Anton reviewed the corporate returns with Frankland. Anton also prepared the individual amended Federal income tax returns for Frankland for 1972 and 1973. According to Anton, the amended individual Federal income tax returns for 1972 and 1973 were prompted because of the additional amounts disclosed at the Sun City Center Bank. Frankland did not disclose to Anton any other sources of income that he might have received or deposited into any other bank account with respect to the 1972 and 1973 amended individual Federal income tax returns. Anton also prepared the individual Federal income tax returns for 1974 and 1975 for Frankland. Frankland left the marital domicile with Louise Frankland in April of 1971. Frankland commenced cohabitation with Delores Warner in January of 1974. Frankland expended the funds received pursuant to the scheme for the personal benefit of himself and Delores Warner. Frankland purchased a Lincoln Continental automobile for Delores Warner and an antique Pierce Arrow and a Jaguar automobile for himself. *241 Frankland purchased a trailer home for Delores Warner. Frankland purchased two parcels of land. Frankland built and maintained the Rebel Stables. Frankland purchased horses for the amount $47,000 during the year 1974. One horse was a race horse named Kilarney Knight. Frankland purchased collector's coins during the years 1972 through 1978 for the amount of $28,000. Frankland purchased jewelry for Delores Warner. Frankland gambled at Las Vegas and horse tracks during the years in issue losing, by his estimate, an average of $20,000 per year. According to Frankland, he used $40,000 which he had buried in his back yard to pay his 1976 taxes. Frankland paid approximately $106,000 in various legal fees. Within the statutory notices of deficiency, respondent determined that Frankland received unreported constructive dividends pursuant to the scheme in the following amounts during the following years: Respondent's DeterminationYearof Unreported Income1972$107,838.63 1973221,650.951974171,124.241975163,789.63197628,067.40197714,469.46Within the statutory notices of deficiency, respondent has determined that the Corporation realized*242 unreported gross receipts in the following amounts during the following years: Respondent's DeterminationTaxable Year Endedof Unreported Gross ReceiptsJuly 31, 1972$29,890.82July 31, 1973168,879.54July 31, 1974173,309.97July 31, 1975209,538.88July 31, 197673,719.15July 31, 197726,528.61July 31, 19782,294.58Respondent computed the deficiencies relating to Frankland and the Corporation using the totals computed from the recap sheets as his starting point. Respondent treated all amounts shown on the recap sheets as income to the Corporation, then treated the Corporation as having paid Frankland a dividend. In computing the income of the Corporation and Frankland, respondent subtracted amounts previously reported as income on the respective returns of petitioners. In computing Frankland's dividend income, respondent also allowed deductions for payments which Frankland made to McKenzie and Sickels in the amount of $159,835.72 for the years 1972 through 1975. The amounts remaining, after these deductions, were treated as dividend income to Frankland Louise Frankland was paid a salary by the Corporation pursuant to the terms*243 of the Agreement. By resolution of the Board of Directors, Louise Frankland's salary was paid to her in her capacity as an officer and director of the Corporation and on account of past services rendered in the business, before it was incorporated. Frankland instructed certain key employees who knew of his salary increases to "keep quiet" about them so that Louise Frankland would not learn of them and demand a salary increase pursuant to the Agreement. After 1971, Frankland did not want his wife on the business premises. Louise Frankland or Robert Carlton, her attorney in all six of the marriage dissolution proceedings, reviewed the joint Federal income tax returns filed by Frankland in order to determine Frankland's salary from the Corporation and his other sources of income. If Frankland's salary increased, Louise Frankland understood that she was entitled to a proportionate raise in her salary under the Agreement. Accordingly, as Frankland's reported income increased so did the salary paid to Louise Frankland. The Corporation deducted on its Federal income tax returns the payments made to Louise Frankland under the Agreement as follows: Taxable YearAmountJuly 31, 1972$10,742July 31, 197310,876July 31, 197411,072July 31, 197511,752July 31, 197612,242July 31, 197712,996July 31, 19782,232*244 Other than the funds Louise Frankland received out of the Corporation beginning in 1971, she received no other means of support from Frankland. During the year 1977, Louise Frankland sought a court order for support. Frankland started paying Louise Frankland out of his personal checking accounts. Louise Frankland did not receive any of the corporate sales receipts diverted by Frankland from the Corporation. The monies received by Louise Frankland from the Corporation beginning in 1971 through 1978 were for the purpose of support. Frankland in his individual capacity was convicted of criminal income tax evasion pursuant to section 7201 for the taxable year 1975. OPINION At the outset, we address petitioners' assertion that respondent's determinations within the statutory notices of deficiency are arbitrary and unreasonable so as not to be entitled to the presumption of correctness. Helvering v. Taylor,293 U.S. 507 (1935). Where the taxpayer establishes that respondent's notice of deficiency was arbitrary and unreasonable, the burden of going forward with the evidence shifts to respondent. In general, we will not look behind the statutory notice of deficiency*245 to examine the evidence used, the propriety of respondent's motives, the administrative policy, or the procedure followed by respondent in the determination of a statutory notice of deficiency. Dellacroce v. Commissioner,83 T.C. 269 (1984); Riland v. Commissioner,79 T.C. 185 (1982); Llorente v. Commissioner,74 T.C. 260 (1980), affd. in part, revd. in part and remanded in part 649 F.2d 152 (2d Cir. 1981); Jackson v. Commissioner,73 T.C. 394 (1979); Greenberg's Express, Inc. v. Commissioner,62 T.C. 324 (1974). The underlying rationale for the foregoing is that a trial before this Court is a trial de novo proceeding. Our determination of a taxpayer's tax liability is based on the merits of the case as presented and not based on an administrative record. Greenberg's Express, Inc. v. Commissioner,supra.In cases involving unreported illegal income, courts have recognized an exception to the general rule of Greenberg's Express, Inc., where respondent introduces no substantive evidence and merely relies on the presumption of correctness as to the determinations*246 within the statutory notice of deficiency and where the taxpayer has challenged the determinations within such notice of deficiency as arbitrary and unreasonable. Dellacroce v. Commissioner,supra;Llorente v. Commissioner,supra; Jackson v. Commissioner,supra.6Petitioners assert that respondent was merely able to trace $501,162.11 or 54 percent of the diverted gross receipts to Frankland. Such amount corresponds to the aggregate amount on the recap sheets marked as "pd.", "paid", "*" or circled by McKenzie. Petitioners assert that respondent's determination that Frankland received the entire amount within the recap sheets was arbitrary and unreasonable. Petitioners maintain that respondent expressed doubt at the administrative level as to whether Frankland had received the entire amount within the recap sheets. Consequently, petitioners assert that the determination within the statutory notices of deficiency are arbitrary and unreasonable so as to shift the burden*247 of going forward to respondent. United States v. Janis,428 U.S. 433 (1976); Helvering v. Taylor,supra;Llorente v. Commissioner,649 F.2d 152 (2d Cir. 1981). Even assuming that cases as Llorente v. Commissioner,supra, are applicable, and in any event, we find that respondent has established by substantial evidence that the determinations within the statutory notices of deficiency were not arbitrary and not unreasonable. Frankland originated and participated in the scheme to divert gross receipts of the Corporation. Frankland does not dispute that respondent has established that 54 percent of the amount shown on the recap sheets was received by him in his individual capacity. Respondent determined that Frankland received the entire amount shown on the recap sheets. Respondent relied upon the representations of McKenzie and Sickels. Respondent, independent of such representations, contacted participating customers and verified that such customers had paid the amount of $646,820.33 pursuant to the scheme. Respondent found no discrepancies between the recap sheets and the independent verification of such participating*248 customers. Consequently, respondent determined that the recap sheets were accurate and that Frankland received the entire amount represented on the recap sheets. Frankland's assertion that actual receipt was limited to 54 percent of the amount shown on the recap sheets is one of the facts for our determination. We find that respondent's determination that Frankland received the entire amount shown on the recap sheets was not arbitrary or unreasonable. Respondent's determination that the diverted gross receipts constituted income of the Corporation in the amounts within the statutory notices of deficiency was not arbitrary or unreasonable. Respondent's determinations are entitled to the presumption of correctness such that petitioners shall bear the burden of going forward as well as the burden of proof. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent's representations and actions prior to the issuance of the statutory notices of deficiency are not relevant to our determinations herein. Greenberg's Express, Inc. v. Commissioner,supra.Frankland concedes the receipt of diverted sales of the Corporation pursuant to the scheme*249 for the taxable years at issue 1972 through 1976 inclusive. 7 Frankland asserts that actual receipt of diverted sales of the Corporation pursuant to the scheme was limited in amount to entries on the recap sheets marked with a notation such as "pd.", "paid", "*", or circled. The sum of such noted diverted sales aggregate $501,162.11 or 54 percent of the total amount of diverted sales shown within the recap sheets. Frankland asserts that no amount of diverted sales of the Corporation was received pursuant to the scheme for the taxable year 1977. Respondent determined that Frankland received unreported constructive dividends pursuant to the scheme during the taxable years ended and in the amounts as follows: Year EndedAmount12-31-72$107,838.6312-31-73221,650.9512-31-74171,124.2412-31-75160,460.4812-31-7628,067.4012-31-7714,469.46*250 Respondent utilized the specific identification method to determine the amount of diverted sales received by Frankland pursuant to the scheme. The recap sheets prepared by McKenzie were the primary source relied upon by respondent to compute the aggregate amount of diverted sales for the taxable years 1972 through 1975. For the taxable year 1976, respondent relied upon the recap sheets and third party contacts. For the taxable year 1977, respondent relied upon the purchase records of third party contacts not reconciled to the sales records of the Corporation to determine the amount of diverted sales. Our focus is to determine the amount of diverted sales received by Frankland pursuant to the scheme during the taxable years 1972 through 1976 and the amount of such diverted sales, if any, received by Frankland during the taxable year 1977. Our determinations are founded upon our careful analysis of respondent's method employed to determine the amount of diverted sales pursuant to the scheme received by Frankland, the degree of correlation, and our determination as to the credibility of the witnesses. We have previously determined that respondent's determinations are entitled*251 to the usual presumption of correctness. Consequently, as noted the burden of proof rests with Frankland. Welch v. Helvering,supra; Rule 142(a). Respondent performed an exhaustive analysis of the financial transactions of the Corporation and Frankland for each of the years in issue. The methodology utilized was to rely on the recap sheets prepared by McKenzie. Respondent sought to verify the amounts shown on the recap sheets and to determine the amount of diverted sales received by Frankland pursuant to the scheme. For each of the taxable years 1972 through 1975 inclusive, respondent determined the amount of unreported constructive dividend income received by Frankland pursuant to the scheme to be the aggregate amount shown on the recap sheets for each such year. Respondent reduced such aggregate amounts to reflect the amount of diverted sales received pursuant to scheme which Frankland deposited at the Sun City Center Bank and reported within Frankland's amended Federal income tax returns for the years 1972 and 1973 filed during the year 1975. 8 Respondent allowed Frankland a deduction for amounts paid to McKenzie, Sickels, McElwain, and Suter and traced*252 to the Sun City Center Bank account for the period 1972 through 1975, inclusive. McKenzie also maintained a black notebook to record amounts received by her pursuant to the scheme. Respondent allowed Frankland a further deduction for payment to McKenzie as evidenced within the black notebook but not traced to the Sun City Center Bank account. Respondent also allowed Frankland a corresponding deduction for an equal amount presumably paid to Sickels as co-participant in the scheme. Respondent relied upon the recap sheets and third party contacts to determine the amount of diverted sales received by Frankland pursuant to the scheme for the taxable year 1976. Respondent relied solely upon third party contacts to determine the amount of diverted sales received by Frankland pursuant to the scheme for the taxable year 1977. Respondent performed an exhaustive analysis of the financial transactions of the Corporation and Frankland*253 during the period encompassed by the recap sheets. The recap sheets were demonstrated to be accurate as respondent verified the representations of the recap sheets with third party contacts. The recap sheets were not maintained after February of 1976. Consequently, respondent, having identified the participating customers in the scheme, further developed the analysis in the absence of the recap sheets. Respondent contacted third party or participating customers who paid amounts constituting 68 percent of the amount shown on the recap sheets. 9 Respondent traced 62 percent of such amount paid by participating customers to Frankland by examination of Frankland's personal bank accounts and Frankland's check cashing practices at various banks. 10 The amount of diverted sales shown on the recap sheets that are marked "paid", "pd.", "*", or circled and verified by respondent's third party contacts represents 53 percent of the amount shown on the recap sheets. 11 The total amount on the recap sheets designated as "paid", "pd.", "*", or circled represents 54 percent of the total amount shown of the recap sheets. 12 Frankland asserts that actual receipt of diverted sales of the Corporation*254 received by him pursuant to the scheme was limited to the amount designated as "paid", "pd.", "*", or circled and that such amount was 54 percent of the total amount shown on the recap sheets, or the amount of $501,162.11. Frankland asserts that such amount is the amount of diverted sales of the Corporation which he, in fact, received pursuant to the scheme. Frankland maintains that McKenzie and Sickels, either in concert or independently, withheld diverted sales of the Corporation pursuant to the scheme for their individual benefit without his knowledge and participation. Frankland maintains that "the record reflects that there is no honor among thieves." While we may, in general, agree with Frankland's assertion regarding the honor among thieves, in this instance we agree with respondent's determinations within the statutory notices of deficiency that Frankland received such amounts. Respondent's reliance upon the recap sheets was inherently reasonable as verified through investigation. In no instance did the recap sheets exhibit an inaccurate record of diverted sale information. *255 We have examined the recap sheets and conclude that the notations marked "paid", "pd.", "*", or circled refer to payments on account made by large customers. Our conclusion is consistent with the testimony of McKenzie. Such entries reflect the 10 percent discount typically extended to participating customers. We observed McKenzie at trial and examined her testimony regarding the documentary evidence. We are convinced of the truthfulness of her assertion that Frankland received the amounts shown on the recap sheets. McKenzie was employed by the Corporation at the time of trial, and such fact militates against Frankland's assertion that McKenzie, either in concert with Sickels or independently, perpetrated the scheme without his knowledge and participation to the extent of $427,046.63. 13 We found the recap sheets to be reliable and accurate. The recap sheets provided respondent the identities of participating customers. Respondent extended the investigation beyond February of 1976, the date the recap sheets were closed, to examine the records of participating customers. *256 We found Sickels to be a credible witness. Sickels corroborated that currency collections at the direction of Frankland were effectuated, initially at raceways and for sometime after respondent's investigation, at airports or distributors. Sickels stated that all currency collected was eventually directed to McKenzie or Frankland. Sickels terminated his involvement in the scheme during the year 1977. In the year 1978, Sickels accepted a final payment of diverted income from James Frankland IV, Frankland's son. While we appreciate the opportunity Sickels had to allow currency "to stick to his palms" during the currency collections, we believe that Sickels' testimony was credible. The amount of diverted sales presumably unaccounted for by Frankland militates against a finding that Frankland was a victim of a scam by Sickels or McKenzie, either independently or in concert. If such a scam was perpetrated independently by Sickels, we believe that Frankland or certainly McKenzie would have uncovered the independent scam. We are also persuaded that Frankland was sufficiently financially aware to have learned of any covert scam between Sickels and McKenzie to divert sales of the*257 Corporation without his knowledge and participation. We found Frankland not to be credible. The scheme was devised to conceal the financial performance of the Corporation from Louise Frankland as well as for the obvious tax considerations. As to the origination of the scheme, Frankland testified that McKenzie and Sickels "came in my office and said, hey, we don't have to declare this money, we don't have to put it in the corporation. I said, 'It sounds good to me. I could use some.'" The scheme remained in operation subsequent to respondent's investigation during the year 1975 because Frankland was certain that the scheme would not be uncovered. Frankland filed amended Federal income tax returns for the taxable years 1972 and 1973 during 1975 reporting only the Sun City Center Bank account deposits. Frankland continued to conceal other diverted sales deposited at the Barnett Bank of Brandon and the Bank of Riverview as well as a significant amount of currency simply deposited to his personal pocket. We found Frankland's assertion that he in fact received only those amounts marked on the recap sheets as "paid", "pd.", "*", or circled to merely be a transparent attempt to obfuscate*258 the obvious trail of funds to him. We have previously found that such notations referred to participating customers who maintained a revolving account. We find Frankland's assertion that he received merely 54 percent of the recap sheet amount 14 as limited to those marked "paid", "pd.", "*", or circled to be self serving and not credible. Frankland reviewed the recap sheets and instructed McKenzie to prepare the recap sheets in his office. Frankland was attuned to the financial success of the Corporation. Frankland purchased significant assets for himself and Delores Warner with the diverted sales of the Corporation. We found the following testimony of Frankland to be instructive: Q. Did you hear the testimony of Audrey McKenzie regarding the amount of monies that she says you received on the recap sheets? A. Yes. Q. Did you receive in 1972 $149,000? A. I don't think so. I don't think I could have spent that much money. Q. Did you receive in 1973 $320,000? A. No. Q. How do you know? A. $320,000 is a lot of money. Couldn't have spent that much, and I have got it saved. Q. All right. Do you know how much you received? A. No, kept no track. I have*259 no records on what I received. Q. Did you receive in 1974 $252,000? A. No sir. Q. Did you receive in 1975 $179,000? A. I wouldn't think so. Q. Why don't you think so? A. Because I'm -- I wouldn't have known what to do with it, spend that much money. No way could I spend that much money. Frankland exhibited a proclivity to ascribe to a life style sometimes described as one dominated by "fast cars and fast horses." The financial success of the Corporation demonstrates Frankland's ability to manufacture industry accepted parts for racing automobiles. The record does not reveal whether Kilarney Knight, the race horse, was fast but the record does indicate that Frankland's gambling losses relative to horse racing were abundant. We are certain that Frankland knew exactly how he desired to spend his share of the fruits of the scheme and was indeed quite capable of spending the amounts determined by respondent. Frankland maintained no records of amounts diverted pursuant to the scheme received by him. McKenzie maintained a record of amounts received by her pursuant to the scheme. McKenzie maintained the recap sheets pursuant to Frankland's instructions. *260 The recap sheets were verified as accurate and reliable by respondent. We found McKenzie to be credible. Frankland diverted gross receipts of the Corporation pursuant to the scheme designed to encourage payment in currency. As Frankland maintained no records of the amounts so diverted, we determine that he has been hoisted upon his own pitard as to the amounts determined by respondent within the statutory notices of deficiency. Consequently, we find that Frankland received the amount of diverted sales pursuant to the scheme for the years 1972 through 1976 inclusive as determined by respondent based on the recap sheets and third party contacts. For the taxable year 1977, respondent determined that Frankland received $14,469.46 of diverted sales of the Corporation. The recap sheets were closed as of February of 1976. Respondent identified participating customers from the recap sheets and determined that Frankland received verified sales from such third party contacts. Respondent identified the amount of $11,102.86 as paid by L. W. Funk Auto Parts, a participating customer, during the year 1977 and not reflected on the Corporation's books and records. We are convinced that respondent's*261 determinations subsequent to the maintenance of the recap sheets are correct. Frankland has failed to satisfy the burden of proof. Respondent determined additions pursuant to section 6653(b) for each of the taxable years at issue. Frankland is estopped by the doctrine of collateral estoppel to deny the presence of fraud for the taxable year 1975 due to his conviction of criminal tax evasion under the provisions of section 7201. Artic Ice Cream Company v. Commissioner,43 T.C. 68 (1964). 15 Frankland concedes the presence of fraud as to the remaining taxable years at issue excepting the taxable year 1977.For purposes of section 6653(b), fraud is a specific intent to evade tax by conduct designed to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Respondent has the burden of proving, by clear and convincing evidence, that some part of an underpayment of tax for each year was*262 due to fraud. Sec. 7454(a); Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be determined upon consideration of the entire record. Estate of Pittard v. Commissioner,69 T.C. 391 (1977); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. in an unpublished opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be imputed or presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970); Otsuki v. Commissioner,53 T.C. 96, 112 (1969). Because direct proof of fraudulent intent is seldom available, respondent may show the requisite intent from the conduct of the taxpayer and the surrounding circumstances. Grosshandler v. Commissioner,75 T.C. 1, 19 (1980); Stone v. Commissioner,56 T.C. 213, 223-224 (1971). A mere suspicion of fraud is insufficient. Davis v. Commissioner,184 F.2d 86, 87 (10th Cir. 1950). We find that respondent demonstrated the requisite intent to establish that Frankland specifically intended to evade tax for the taxable year 1977. The diverted sales of the Corporation*263 corresponded to the pattern developed pursuant to the scheme with McKenzie and Sickels. L. W. Funk Auto Parts was a participating customer whom respondent identified from the recap sheets. Respondent established that L. W. Funk Auto Parts purchased products of the Corporation which were not recorded on the Corporation's books. Frankland was well aware when he filed his 1977 Federal income tax return of respondent's investigation. We find that the underpayment of tax for 1977 as determined by respondent was due to fraud within the meaning of section 6653(b). We also determine that the amended Federal income tax returns filed by Frankland for the taxable years 1972 and 1973 during the year 1975 were fraudulent and that Frankland is liable for the increased additions to tax for such years as requested by respondent within the amendment to answer. The amended Federal income tax returns report the fraudulent activity concerning the Sun City Center Bank account. Frankland failed to report additional diverted sales pursuant to the scheme uncovered by respondent. We find that such omission was due to specific fraudulent intent to evade tax. Frankland Racing asserts that the acts*264 of Frankland, Sickels, and McKenzie pursuant to the scheme to divert sales should not be imputed to the Corporation because the Corporation derived no benefits from the scheme and because the scheme concerned "private transactions" of the individuals involved. Frankland Racing further asserts that, if we find that the diverted sales constituted gross income to the Corporation, then the Corporation is entitled to an offsetting theft loss. Respondent determined that Frankland Racing failed to report gross receipts diverted pursuant to the scheme and that Frankland Racing is not entitled to an offsetting theft loss. We agree with respondent's determinations for each taxable year at issue. A corporation is taxable on monies received from transactions authorized by it or within the scope of its corporate activities, or where it has command over the receipt of such monies. Union Stock Farms v. Commissioner,265 F.2d 712 (9th Cir. 1959). The payments at issue were supported by informal invoices designed to circumvent the internal bookkeeping procedures of the Corporation. We are certain that some of the participating customers were aware that the scheme was developed*265 to divert gross receipts because of Frankland's marital difficulties as well as the obvious tax considerations. It is axiomatic that a corporation may act only through its officers and agents. Asphalt Industries, Inc. v. Commissioner,384 F.2d 229, 231 (3d Cir. 1967). The critical inquiry here, however, is whether Frankland dominated the Corporation such that his fraudulent acts are imputed to the Corporation. We find that domination and control existed such that Frankland Racing participated and acquiesced to the scheme through Frankland. Frankland Racing asserts that the fraudulent acts of Frankland pursuant to the scheme are not attributed to the Corporation such that Frankland Racing did not realize income in the form of diverted gross receipts. Asphalt Industries, Inc. v. Commissioner,supra;Botwinik Brothers of Mass., Inc. v. Commissioner,39 T.C. 988 (1963); All Americas Trading Corp. v. Commissioner,29 T.C. 908 (1958); Sherin v. Commissioner,13 T.C. 221 (1949). In Botwinik Brothers of Mass., Inc. v. Commissioner,39 T.C. at 997, we determined that the fraudulent*266 acts of a shareholder-employee were effectuated adversely to the interests of the taxpayer-corporation therein, rather than on behalf of, such that the misappropriated funds did not constitute income to the taxpayer-corporation. The shareholder-employee concerned in that instance was a minority 5.33 percent shareholder-employee. We stated that the fact that the fraudulent acts were committed by a minority shareholder, "whose interests were adverse to those of the corporation and the majority stockholders, is of crucial significance." [Citations omitted.] We distinguished the facts in Botwinik Brothers of Mass., Inc., from those cases where we determined that the fraudulent acts of a sole or dominant shareholder were attributed to a corporate entity. 39 T.C. at 996-997. In Sherin, the deficiency was determined as to certain payments by customers to the corporate-taxpayer's president for silk goods at prices over the OPA ceiling price. Such funds were used for the president's personal benefit. In All Americas Trading Corp., the deficiency was determined as to certain "kickbacks" received by the president. In both cases, we held that the payments were*267 not income to the corporations. Frankland Racing points to the nature of the transactions in those cases as being beyond the usual, lawful business operation of those corporations. Frankland Racing claims that, since Frankland's scheme was also illicit, the monies received should not be characterized as income to Frankland Racing, but, rather, as income only to Frankland individually. The factual patterns in the cases cited by petitioner are, however, significantly distinguishable from the facts of this case. In All Americas Trading Corp., the president, one Avirgan, was, during the years in issue, a minority shareholder at first and then merely a salaried employee. His main function was that of purchasing agent. The majority shareholder, Tandeter, "directed and controlled the corporate operations, giving complete instructions to Avirgan on how to conduct the business of [the corporation.]" 29 T.C. at 910. Suppliers of the corporation had an oral arrangement with Avirgan personally whereby Avirgan received kickbacks on purchases made. The payments were not made to or through the corporation nor upon the corporation's invoices. We held that the monies received*268 were received by Avirgan under a claim of right and not on behalf of the corporation. 29 T.C. at 913. We distinguished the numerous cases where money received by virtue of such a scheme was held to be income to the corporation 16 and concluded: Avirgan was only a minority shareholder, although he was entitled to 50 per cent of the profits, until June 21, 1950, after which date he held no beneficial title to any stock. He was only the nominal president of petitioner, although having the power to sign checks binding the petitioner. He was in reality only a purchasing agent, with Tandeter in actual control of the petitioner. Avirgan cannot be regarded as acting for the corporation in receiving the kickbacks. * * * [29 T.C. at 913.] In Sherin, the taxpayer-corporation operated a manufacturing and sales business. Berger and Sherin were equal*269 shareholders. Berger was president and in complete charge of the sales operations working out of the corporate offices in New York City. Sherin, the secretary-treasurer, managed the production operation at the Elmira, New York, plant. Berger made a secret arrangement to receive kickbacks from buyers in the form of an excess amount over the OPA ceiling prices. Sherin knew nothing of the plan. All funds were payable to Berger, individually. The president was not a majority or controlling shareholder and his actions could not be characterized as those of the corporation. We held that the corporation had not authorized the illicit payments and therefore there was no income to the corporation. The corporation in Sherin never received any benefit from the transaction. "Command over the income," we said, "is a primary test of taxability." 13 T.C. at 229. 17In Asphalt Industries, Inc., the Court of Appeals for the Third Circuit determined that the fraudulent acts of one Anderson, a 50 percent shareholder, were not attributed to the taxpayer-corporation because one Schwoebel who owned*270 the remaining 50-percent interest was "not Anderson's creature and cannot be deemed to have acquiesced in whatever Anderson would do." 384 F.2d at 234. That Court also stated that, "Within the framework of what are essentially sole proprietorships or intimate incorporated partnerships fall those fraud cases where the wrongdoer so dominates the corporation that it is in reality the creature of his will." 384 F.2d at 234. We find that the facts of the instant case are within such framework. We are convinced that Frankland dominated the Corporation including the scheme so that the diverted gross receipts of the Corporation constitute gross income to Frankland Racing. Frankland owned 90 percent of Frankland Racing. Frankland served as president of the Corporation and monitored the business affairs each day. Frankland was aware of the financial condition of the Corporation. Frankland originated the scheme to conceal the financial performance of the Corporation from Louise Frankland and to evade tax. Frankland compensated McKenzie and Sickels for their participation. Frankland extended a discount to participating customers. Louise Frankland owned 9.8 percent*271 of the Corporation; however, Louise Frankland was so dominated by Frankland that she was not permitted access to the business premises during the years in issue. Louise Frankland was not active in business and was not informed as to the true financial performance of the Corporation. Frankland dominated the Corporation to such extent as to require the Corporation's participation in the scheme designed to divert gross receipts as part of his diabolical approach to his matrimonial settlement. Frankland's personal difficulties are imbued with the business affairs of the Corporation so as to mandate our determination that Frankland dominated Frankland Racing such that his fraudulent acts are attributed to the Corporation. Frankland Racing benefitted to the extent that Frankland exercised command of the scheme to determine the amount of diverted gross receipts and the participating customers. Respondent's determinations of the amount of income realized in each taxable years is presumptively correct. Frankland Racing asserts that such amount received by Frankland and attributed to the Corporation should be limited to 54 percent of the recap sheet amount, specifically those designated*272 "paid", "pd.", "*", or circled by McKenzie. We have previously detailed our findings as to the amount of diverted gross receipts received by Frankland. Respondent determined the source and the amount of diverted sales pursuant to the scheme for fiscal years ended July 31, 1977, and July 31, 1978, through the expansion of the investigation of participating customers identified within the recap sheets. Within the statutory notice of deficiency, respondent determined that participating customers paid the Corporation the amount of $26,528.61 not recorded on the books and records of the Corporation for the fiscal year ended July 31, 1977. 18 The identified participating customers relate to sales diverted pursuant to the scheme as perpetrated in prior years covered by the recap sheets. Specifically, L. W. Funk Auto Parts, S & S Auto Supply, Andy's Speed Supply, and Buzzi Reutimann participated in the scheme with regularity. Respondent determined that the Corporation failed to record one sale to L. W. Funk Auto Parts in the amount of $2,294.58 for fiscal year ended July 31, 1978. We are convinced that the omission of gross income for fiscal years ended July 31, 1977, and July 31, 1978, from*273 participating customers identified by respondent from the recap sheets was in the furtherance of the scheme. Such amounts were diverted subsequent to respondent's investigation. Consequently, we find that Frankland Racing received the amount of gross receipts as determined by respondent for each taxable year at issue. Respondent has also established by clear and convincing evidence that the Federal income tax returns of Frankland Racing were fraudulent. Frankland Racing is liable for the 6653(b) addition to tax for each year as determined by respondent. As to the section 6653(b) addition to tax for fiscal year ended July 31, 1978, we are convinced that the sale to L. W. Funk Auto Parts was omitted from income with the specific intent to evade tax. L. W. Funk Auto Parts was a primary participating customer. Frankland's intent to evade tax was not thwarted even by respondent's investigation commenced in the year 1975. Frankland's actions subsequent to the investigation of respondent were indicative of a specific intent to continue to divert funds in currency. *274 Frankland Racing asserts that it is entitled to an offsetting embezzlement loss deduction pursuant to section 165 for each taxable year in which Frankland diverted gross receipts of the Corporation. Respondent asserts that no embezzlement occurred where a dominate shareholder misappropriates corporate monies as the requisite intent to embezzle is absent. Ruidoso Racing Association, Inc. v. Commissioner,476 F.2d 502 (10th Cir. 1973); Federbush v. Commissioner,34 T.C. 740 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963). The focus is one of intent. The record indicates that Frankland had no intent to embezzle from Frankland Racing as his objective was to conceal the financial performance of the Corporation from Louise Frankland and to evade tax. The funds diverted pursuant to the scheme are accurately classified as constructive dividends. 19We determine that Frankland Racing is not entitled to deduct any amount paid to Louise Frankland as officer compensation. Section 162(a)(1) allows a deduction for a reasonable allowance paid as ordinary and necessary expenses*275 salaries or other compensation for personal service actually rendered. Whether payments are intended to be compensation for services rather than a distribution of profits is a question of fact. Paula Construction Company v. Commissioner,58 T.C. 1055, 1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). We are persuaded that the payments to Louise Frankland were intended as support payments. Frankland did not cohabit with Louise Frankland during the years at issue and provided no assistance other than the disputed salary at issue. Louise Frankland provided no service to Frankland Racing during the years at issue. We agree with respondent's determination that Frankland Racing is not entitled to deduct salary payments to Louise Frankland during the years at issue. Frankland Racing is not entitled to deduct as salary to Frankland the additional respective amounts shown on the fraudulent amended Federal income tax return for the fiscal year ended July 31, 1973, and the fraudulent Federal income tax return for fiscal year ended July 31, 1974. 20 Such amounts correspond to the diverted gross receipts deposited in Frankland's Sun*276 City Center Bank account. We have determined that such amounts were constructive dividends, not salary. Furthermore, we are not persuaded that the amount within such Federal income tax returns as filed and amended and deducted as salary was reasonable compensation for Frankland's activities. Given the prior salary history of the Corporation, we conclude such amounts were orchestrated to correspond to the amount of funds diverted pursuant to the scheme and deposited in the Sun City Center Bank. Consequently, such amounts are characterized as dividend income. Respondent disallowed within the statutory notice of deficiency the amount of $10,000 deducted as a professional fee by Frankland Racing for the fiscal year end July 31, 1975. During the year 1975 and subsequent to respondent's investigation, Frankland effectuated the filing of amended Federal income tax returns to report the existence of diverted gross receipts of the Corporation deposited in the Sun City Center Bank account. The*277 attorney representing Frankland in his marital dissolution, Maney, hired Anton to prepare amended corporate Federal income tax returns for the Corporation and amended individual Federal income tax returns for Frankland for the respective taxable years of July 31, 1972, and July 31, 1973, as to the Corporation, and December 31, 1972, and December 31, 1973, as to Frankland. Maney paid Anton the amount of $10,000 on behalf of Frankland and the Corporation for the preparation of the amended Federal income tax returns. Frankland paid Maney with diverted funds of the Corporation received pursuant to the scheme. We find that Frankland Racing is entitled to deduct the amount of $5,000 as a professional fee paid for the preparation of the amended Federal income tax returns of the Corporation. The preparation of the amended Federal income tax returns for the Corporation was an ordinary and necessary business expense deductible pursuant to section 162(a). We determine this amount as it represents one-half of the professional fee paid and approximates the proportional amount of deficiencies owed for the corresponding taxable years by the Corporation. Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930).*278 We further determine Frankland is entitled to deduct the amount of $5,000 pursuant to section 212(3) for the taxable year 1975 as Frankland paid Maney on January 24, 1975, to commence the preparation of the amended Federal income tax returns. Section 6501(c)(1) provides that tax may be assessed at any time in the case of a false or fraudulent return filed with the intent to evade tax. We have determined that Frankland and Frankland Racing filed a false or fraudulent Federal income tax return with an intent to evade tax for the year or years in issue. Consequently, the statute of limitations does not operate to bar assessment of tax as to any determination at issue. To reflect the foregoing, Decisions will be entered for respondent in docket Nos. 5523-80, 9509-80, 29106-81, and 29107-81.Decisions will be entered under Rule 155 in docket Nos. 4661-81 and 4662-81.Footnotes1. The following cases have been consolidated herewith: James Frankland, docket No. 9509-80; James Frankland, docket No. 4661-81; Frankland Racing Equipment, Co., Inc., docket No. 4662-81; Frankland Racing Equipment, Inc., docket No. 29106-81; and James Frankland, Jr., docket No. 29107-81.↩2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩3. Consequently, respondent determined deficiencies in the Federal income tax for petitioner James Frankland, Jr., and asserts increased additions thereto for the taxable years 1972 and 1973 as follows: ↩IncreasedTaxableSec. 6653(b)YearDeficienciesAddition1972$45,557.48$31,765.781973112,891.8881,847.344. McKenzie left the Corporation on March 24, 1978, returned in 1982, left again sometime in 1982, returned in 1983, and remained employed there at least through the date of trial. ↩5. Suter had a break in employment from Jan. 7, 1977, through July 15, 1977.↩6. Gerardo v. Commissioner,T.C. Memo. 1975-341, affd. in part, revd. in part and remanded in part 552 F.2d 549↩ (3d Cir. 1977).7. We note that Frankland is estopped by the doctrine of collateral estoppel as to the existence of fraud under the provisions of sec. 6653(b) for the taxable year 1975 due to Frankland's criminal conviction for income tax evasion pursuant to sec. 7201 for such year. We must, however, determine the amount of the corresponding underpayment.↩8. Frankland reported the following additional income from the Corporation on his 1972 and 1973 amended joint Federal income tax returns: ↩19721973Bonus$35,647.09$90,220.00Dividend7,935.53$35,647.09$98,155.539. $646,820.33/$928,208.74. ↩10. $401,017.34/$646.820.33. ↩11. $491,945.48/$928,208.74. ↩12. $501,162.11/$928,208.74. Frankland asserts on brief that the applicable percentage was 53 percent corresponding to the amount of diverted sales designated as "paid", "pd.", "*", or circled. We assume that Frankland refers to the $501,162.11/$928,208.74 ratio which is 53.99 percent.↩13. ↩Total recap sheet amount$928,208.74 Total entries marked "paid", "pd.", "*",or circled(501,162.11)$427,046.63 14. $501,162.11.↩15. Passero v. Commissioner,T.C. Memo. 1982-218↩.16. See Drybrough v. Commissioner,238 F.2d 735 (6th Cir. 1956); Currier v. United States,166 F.2d 346 (1st Cir. 1948); Estate of Simmons v. Commissioner,26 T.C. 409 (1956); United Dressed Beef Co. v. Commissioner,23 T.C. 879↩ (1955).17. Laputka v. Commissioner,T.C. Memo. 1981-730↩.18. ↩OmittedSourceAmountL. W. Funk Auto Parts$17,545.17S & S Auto Supply2,000.00Andy's Speed Supply378.82Buzzi Reutimann1,556.62Margaret Bosley688.00Floyd Killsworth200.00S & S Auto Supply1,000.00Funk450.00S & S and Funk400.00Cash500.00Cash1,810.00$26,528.6119. Laputka v. Commissioner,supra.↩20. ↩Return Amount asDisallowedFiscal Year EndedFiled or AmendedReturn AmountJuly 31, 1973$124,980.00$90,200.00July 31, 1974124,270.7887,377.38