T.C. Memo. 1999-235

UNITED STATES TAX COURT

SIMCO AUTOMOTIVE PUMP CO., INC, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JOHN R. MACLEAN, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 1730-96, 1731-96.          Filed July 21, 1999.

Joseph Falcone, for petitioners.

Brian H. Rolfe, for petitioner in docket No. 1731-96.

Timothy S. Murphy, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes and fraud penalties as follows:

Petitioner Simco Automotive Pump Co., Inc. (Simco):

| Fiscal year | Deficiency | Fraud penalty sec. 6663 |
|---|---|---|
| June 30, 1990 | $24,453 | $18,340 |
| June 30, 1991 | 27,225 | 20,419 |

Petitioner John R. MacLean (John):

| Year | Deficiency | Fraud penalty sec. 6663 |
|---|---|---|
| 1989 | $2,423 | $4,464 |
| 1990 | --- | 16,664 |
| 1991 | 11,089 | 18,332 |

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

We must decide the following issues:

(1) Whether John had unreported income in the amounts of $9,905 in 1989 and $34,731 in 1991. We hold that he did.

(2) Whether Simco is entitled to deduct, as compensation, certain income received by John resulting from sales of scrap metal. We hold that Simco is not.

(3) Whether John committed fraud in not reporting income from scrap metal sales for the years in issue. We hold that he did.[1]

(4) Whether Simco committed fraud or, in the alternative, was negligent in not reporting income from scrap metal sales for the years in issue. We hold that Simco is not liable for either.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts, supplemental stipulation of facts, and attached exhibits. At the time of filing the petitions, Simco's offices were located in Detroit, Michigan, and John resided in Bloomfield Hills, Michigan.

Overview

Simco was a corporation engaged in the reconditioning and resale of automobile water pumps. Simco's taxable year was a fiscal year ending June 30. John and his brother Neal MacLean

---

[1] John raised as an affirmative defense in his amended petition, and petitioners argue on brief, that assessment is barred by the statute of limitations on assessment and collection in sec. 6501. Because we find that John committed fraud, the period of limitations remains open, and respondent may assess at any time. See sec. 6501(c)(1).

(Neal) each owned 50 percent of Simco's stock.  Neal was president of Simco, and John was vice president.

The issues in these cases revolve around the proceeds from John's sale of scrap metal.  In August or September of 1989, John began selling scrap metal that belonged to Simco and retaining the proceeds from the sales.  At the time, John had a problem with alcohol abuse.  The sales continued through the years in issue.  Neal did not become aware of the scrap metal sales until August of 1992.  The scrap metal sales proceeds were not reported on either Simco's or John's tax returns for the years in issue as originally filed.  However, both Simco and John filed amended returns for such years in September 1992, on which a substantial portion of the proceeds was reported.

The Scrap Metal Sales

Prior to 1989, there were no sales of Simco scrap metal. Although Simco generated scrap metal from its operations, the scrap was treated as refuse because the company did not have the space to sort and store it.  In August or September of 1989, John first arranged sales of Simco's scrap metal.  This was shortly after Simco began using an additional building, which was known as the Prospect building, giving John the ability to sort and

store scrap metal.[2]  The sales of scrap metal continued into 1992.

John sold the scrap metal to Dix Scrap Iron & Metal Co. (Dix Scrap).  John contacted the president of Dix Scrap, John Brooks, to arrange the sales of the scrap metal.  In general, when Dix Scrap bought scrap metal, it would pay by either cash or check, although use of a check was more convenient for Mr. Brooks.  When John arranged the sales of scrap metal to Dix Scrap, he specifically asked Mr. Brooks to pay in cash, and Mr. Brooks did so.  John was the only individual associated with Simco with whom Mr. Brooks dealt.

Dix Scrap hauled the scrap metal from the Simco plant, weighed it, and wrote out a weight ticket for each load.  Each weight ticket indicated the date, the type of scrap metal, the weight, the unit price, and total price.  Every week or two, John would go to Dix Scrap to collect payment for the scrap metal.  He would sign the accumulated weight tickets and take the tickets and the cash.  Dix Scrap did not send copies of weight tickets, or a statement of the sales, to Simco.  Further, John did not request such documentation to be sent to Simco, and Mr. Brooks did not think he was supposed to supply any such documentation.

---

[2] Simco's main building, which was known as the Buchanan building, contained the main offices and the production facilities.  John worked in the Prospect building.  The Prospect building contained the purchasing and shipping facilities.

During the years in issue, Dix Scrap purchased scrap metal belonging to Simco as follows, with all payments in cash made directly to John, which he retained:

| Period relating to Simco's year | Total amount | Total number of separate sales |
|---|---|---|
| July 1, 1989 - June 30, 1990 | $62,699 | 63 |
| July 1, 1990 - June 30, 1991 | 80,589 | 106 |
| July 1, 1991 - Dec. 31, 1991 | 33,870 | 60 |

| Period relating to John's year | Total amount |
|---|---|
| July 1, 1989 - Dec. 31, 1989 | $21,258 |
| Jan. 1, 1990 - Dec. 31, 1990 | 79,351 |
| Jan. 1, 1991 - Dec. 31, 1991 | 76,550 |

Neal's Discovery of the Scrap Metal Sales

Simco's accountant was Wayne Boyer. Mr. Boyer prepared Simco's, as well as John's and Neal's, tax returns and kept Simco's books. However, Mr. Boyer was not a certified public accountant. Thus, once a year, Mr. Boyer would ask another accounting firm to do a review and compilation of Simco's books.[3]

_____

[3] A compilation involves putting a business' financial information into a financial statement format. A review involves analytical procedures, such as comparisons of financial ratios,

(continued...)

For Simco's June 30, 1991 fiscal year, the review and compilation was prepared by Judy Zaremba and Jane Brodsky. Ms. Brodsky discussed the review and compilation with Mr. Boyer. In addition, because she was aware that firms with operations similar to Simco's commonly have scrap metal sales, she raised the question of scrap metal sales with Mr. Boyer. Ms. Zaremba prepared a checklist, dated October 10, 1991, explaining some of the reporting requirements used in the review and compilation. Ms. Brodsky added the following handwritten note to the checklist: "Scrap sales will be looked into by Wayne's client". However, following the review and compilation, Mr. Boyer did not raise the issue of scrap metal sales with anyone associated with Simco.

Dix Scrap was audited by the Internal Revenue Service (IRS) beginning sometime in 1992 and ending in October of the same year. While the audit was taking place, Mr. Brooks called individuals from whom he had purchased scrap metal for cash, including John, and advised them that the IRS was auditing Dix Scrap and examining documentation with respect to Dix Scrap's cash purchases. After receiving the call from Mr. Brooks, John called Mr. Boyer sometime between April and July of 1992, to inform Mr. Boyer about the scrap metal sales that he had been

---

[3](...continued)
to ensure records are being kept properly.

engaged in since 1989.  Mr. Boyer began to prepare amended tax returns for Simco and John sometime prior to August of 1992.

During the period from 1989, when he began selling Simco's scrap metal, until 1992, John did not tell Neal, or anyone else associated with Simco, about the scrap metal sales.  Neal did not become aware of the sales of scrap metal until August of 1992, during one of Simco's shareholders' meetings.  The meeting was attended by Neal, John, and Mr. Boyer.  At the meeting, either John or Mr. Boyer brought up the issue of the scrap metal sales. After Neal heard about the scrap metal sales at the meeting, he contacted Simco's comptroller, James Kissick, who was unaware of the sales to that point.  Thereafter, Simco decided that John could keep all of the proceeds from the scrap metal sales.[4]  Neal asked Mr. Boyer to adjust Simco's books and file the amended returns.  John had been unable to locate the weight tickets previously issued by Dix Scrap, so he obtained copies from Mr. Brooks to ascertain the amounts received from the scrap metal sales in order to permit the filing of the amended returns.  Mr. Boyer decided how to treat the proceeds from the scrap metal sales on Simco's tax returns.

Recording and Reporting the Income

---

[4] As discussed infra, Simco treated some of the proceeds as compensation paid to John and some of the proceeds as repayment of part of a loan from John to Simco.

## Simco's Books and Records

Simco did not record any scrap metal sales on its books and records for the period July 1, 1989, through December 31, 1991. As of the date of the filing of Simco's tax returns for the 1990 and 1991 fiscal years, the corporate books did not reflect that the proceeds from the scrap metal sales for the period July 1, 1989, through June 30, 1991, were compensation to John.

The total proceeds received from the sale of scrap metal to Dix Scrap and retained by John during Simco's fiscal year ended June 30, 1992, equaled $78,621.02. Sometime after June 30, 1992, Simco recorded this amount in its books as a reduction in the balance of loans previously made to Simco by John.[5] Of this amount, $33,870.00 was received and retained by John during the period from July 1 through December 31, 1991, and the remainder was received from January 1 through June 30, 1992.

## Simco's Tax Returns

Neal assumed responsibility for filing Simco's tax returns and signed both the original and the amended returns on behalf of Simco. Simco's original tax returns for fiscal years ended

---

[5] Although the parties stipulated that the $78,621.02 in scrap metal sales proceeds received from Dix Scrap "was booked as a loan to John MacLean from Simco", the exhibits and testimony demonstrate that the $78,621.02 was actually recorded as a repayment of amounts previously lent to Simco by John. The Court may disregard a stipulation where it is clearly contrary to the evidence in the record, and we do so here. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195-196 (1989).

June 30, 1990 and 1991, did not report any proceeds from the sales of scrap metal. On its original tax returns, Simco reported the following compensation for Neal and John:

| Fiscal year | Neal | John |
|---|---|---|
| June 30, 1990 | $297,150 | $316,398 |
| June 30, 1991 | 367,350 | 352,850 |

On its amended returns for fiscal years ended June 30, 1990, and June 30, 1991, which were filed on or about September 25, 1992, Simco reported the following income and claimed the following deductions:

| Fiscal year | Net change in income | Net change in deductions |
|---|---|---|
| June 30, 1990 | $54,178 | $54,178 |
| June 30, 1991 | 79,728 | 79,728 |

Each income adjustment was explained as an "increase in sales", and each deduction adjustment as an "increase in salaries".

### John's Tax Returns

John's original returns for his tax years 1989 through 1991 did not report proceeds from scrap metal sales. On his amended returns, John reported the following income:

| Calendar year | Net change in income |
|---|---|
| Dec. 31, 1989 | $11,353 |
| Dec. 31, 1990 | 210,734 |
| Dec. 31, 1991 | 41,819 |

Each income adjustment was explained as "additional income".

### Notices of Deficiency

In the notice of deficiency with respect to Simco, respondent determined inter alia that Simco had unreported income in the amounts of $8,521 for its taxable year ended June 30, 1990, and $860 for its taxable year ended June 30, 1991. The amounts determined to be unreported income in these years represent the difference between the proceeds from the scrap metal sales to Dix Scrap and the amounts reported as additional income on Simco's amended returns, as follows:

| Fiscal year | Scrap metal proceeds | Amount reported on amended return | Unreported income determined |
|---|---|---|---|
| 6/30/90 | $62,699 | $54,178 | $8,521 |
| 6/30/91 | 80,589 | [1]79,728 | 860 |

[1]Respondent treated the amount reported on the amended return as being $79,729.

In addition, respondent determined that Simco is not entitled to the claimed offsetting deductions for "increase in salaries" in the amounts of $54,178 and $79,728 for its 1990 and 1991 taxable years, respectively.

In the notice of deficiency with respect to John, respondent determined inter alia that John had unreported income in the amounts of $9,905 for tax year 1989 and $34,731 for tax year 1991. The amounts determined to be unreported income in these years represent the difference between the scrap metal sales proceeds retained by John and the amounts he reported as additional income on his amended returns, as follows:

| Year | Scrap metal proceeds | Amount reported on amended return | Unreported income determined |
|------|---------------------|----------------------------------|------------------------------|
| 1989 | $21,258 | $11,353 | $9,905 |
| 1991 | 76,550 | 41,819 | 34,731 |

OPINION

## Unreported Income

The first issue is whether John had unreported income in the amounts determined by respondent.  The parties have stipulated that Simco sold scrap metal in exchange for the proceeds specified above during the years at issue and that such proceeds were retained by John.  Simco reported as income on its amended returns a significant portion of those proceeds.  Simco concedes on brief that the balances of the proceeds not reported on Simco's amended returns, $8,521 in fiscal year 1990 and $860 in fiscal year 1991, are unreported income as determined by respondent.  With respect to John, for tax year 1989 petitioners present no argument as to the unreported income determined by respondent, and we treat the issue as conceded.  With respect to John's 1991 tax year, petitioners argue that the proceeds he retained from the sale of scrap metal from July 1, 1991 through December 31, 1991 (the first half of Simco's fiscal year ended June 30, 1992) represent repayment by Simco of money that John

had previously lent to Simco, and therefore that such proceeds were not income to him.[6]

In general, amounts received as repayment of a loan are not included in income. See Kudo v. Commissioner, T.C. Memo. 1998-404. "Whether * * * an advance made by a shareholder to a corporation creates a true debtor-creditor relationship is a factual question to be decided based on all relevant facts and circumstances." Haag v. Commissioner, 88 T.C. 604, 615 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). Whether or not a loan exists depends on the intent of the parties at the time of the transaction. See Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970). By the same token, whether or not the transfer of funds constitutes the repayment of a loan depends on the intent of the parties at the time of the transfer. Where the transaction claimed to be a loan is between a corporation and a controlling shareholder, the situation invites special scrutiny. See

---

[6] Petitioners' argument applies to the proceeds from scrap metal sales retained by John during the latter half of his 1991 tax year, which the parties have stipulated totaled $33,870. However, respondent determined that John had unreported income of $34,731 for tax year 1991 and maintained that position on brief. Petitioners have not addressed this $861 discrepancy, and we accordingly treat this difference as either conceded by petitioners or decided adversely to them, due to our rejection hereinafter of the claim that any portion of the scrap metal proceeds received by John in 1991 constituted the repayment by Simco of a loan to it by John.

Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1339 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974); Haber v. Commissioner, supra at 266. Because both Simco shareholders acquiesced in the treatment of the proceeds from the latter half of 1991 as a loan repayment, we believe special scrutiny is appropriate in the instant cases.

Based on all the facts and circumstances, we find that petitioners have failed to prove that John's retention of the proceeds from scrap metal sales during the period July 1 through December 31, 1991, was intended to be the repayment of a loan. First, we note the general confusion on the part of petitioners about who lent what to whom. Petitioners executed stipulations in these cases stating that Simco characterized the scrap metal proceeds received during its fiscal year ended June 30, 1992 as a loan from Simco to John. In his opening statement at trial, petitioners' counsel argued that these proceeds "should be considered a loan to Mr. McLean". However, on brief, for the first time, petitioners take a different position; namely, that these proceeds constituted Simco's repayment of a loan to it by John. This mutation in petitioners' position is emblematic of the confused state of the record regarding the purported loan transaction. Although the record contains copies of certain demand notes obligating Simco to pay John (and Neal) various amounts, the notes themselves are ambiguous as to their date of

execution,[7] and there is no other evidence in the record of the time when the notes were executed. Further, the notes provide for interest at a rate of 9 percent, yet there is no evidence that Simco paid John any interest. Certainly John has not claimed that any portion of the retained proceeds that he now seeks to characterize as a loan repayment is interest; he claims the entire amount as nontaxable return of principal. Although Neal and Simco's comptroller both testified that John and Neal typically lent their annual bonuses back to the corporation, petitioners have not demonstrated any relationship between these bonus amounts and the purported indebtedness of Simco to John and Neal.[8] Finally, even if Simco had any indebtedness to John, it is indisputable that Simco lacked intent to make a loan repayment at the time when John was secretly diverting corporate proceeds; no one acting in behalf of the corporation had knowledge of the diversions at that time. The loan repayment characterizations are entirely ex post facto; although Simco's books reflect that

---

[7] Although the three notes for John each recite that they were signed on "the day and year first above written", at the top of each document the only dates which appear are as follows: "Effective: June 30, 1989", "Effective: June 30, 1990", and "Effective: June 30, 1991". We find that this phrasing raises an ambiguity as to the date of execution.

[8] Similarly, certain corporate minutes introduced into the record recite salaries for John and Neal that do not bear any discernible connection to amounts purportedly lent back to the corporation.

as of June 30, 1992, the outstanding balance of Simco's loans to John was reduced in an amount equal to the purported loan repayment amount, Simco's comptroller testified that such an entry was likely made <u>after</u> that date. Based on the foregoing, we hold that John is not entitled to exclude from income the $33,870 in scrap metal proceeds he retained during the latter half of 1991.

<u>Compensation Deduction</u>

Section 162(a)(1) allows as a deduction "a reasonable allowance for salaries or other compensation for personal services actually rendered". The test for deductibility under this provision is two-pronged: Payments are deductible as long as they "(1) do not exceed the reasonable compensation for the services actually rendered, and (2) are actually intended to be paid purely for the services." <u>Electric & Neon, Inc. v. Commissioner</u>, <u>supra</u> at 1340; see sec. 1.162-7(a), Income Tax Regs. Petitioners have the burden of proof. See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

In the instant case, Simco fails the second prong, if not both. To satisfy the second prong, the payments in question must have been made with the intent to compensate. See <u>King's Court Mobile Home Park, Inc. v. Commissioner</u>, 98 T.C. 511, 514 (1992) (citing <u>Paula Constr. Co. v. Commissioner</u>, 58 T.C. 1055, 1058 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir.

1973)).  The question of whether payments were made with an intent to compensate is a question of fact, bearing in mind that transactions between closely held corporations and their stockholders are examined with close scrutiny.  See Paula Constr. Co. v. Commissioner, supra at 1058-1059.  The requisite intent must have existed when the purported compensation payment was made.  See id. at 1059-1060.  In the instant case, Neal, the other 50-percent shareholder, did not even know about the scrap metal sales until August 1992, well after John had received the payments, for which Simco claims a compensation deduction.  The contemporaneous corporate records obviously did not record the amounts as compensation because the amounts were not recorded at all.  It was only after Neal learned about the scrap metal sales that the proceeds therefrom were recorded and characterized in the amended returns as compensation.  There was no intent to compensate when John actually received the payments.  See Tool Producers, Inc. v. Commissioner, T.C. Memo. 1995-407, affd. per curiam without published opinion 97 F.3d 1452 (6th Cir. 1996).  Therefore, we hold that petitioner Simco is not entitled to the claimed deduction for compensation.

Fraud of John

Fraud exists if "any part of any underpayment of tax required to be shown on a return is due to fraud". Sec. 6663(a). John filed amended tax returns for each of the tax years 1989-1991 showing increases in tax owed, effectively conceding that there was an underpayment in each year. Thus, we must decide whether any portion of each underpayment was due to fraud.

The existence of fraud is a question of fact. See Hagaman v. Commissioner, 958 F.2d 684, 696 (6th Cir. 1992), affg. and remanding on other grounds T.C. Memo. 1987-549. Respondent has the burden of proof to show fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b). To establish fraud, respondent must show that the taxpayer "engaged in conduct with the intent to evade taxes that he knew or believed to be owing." United States v. Walton, 909 F.2d 915, 926 (6th Cir. 1990). We may rely on circumstantial evidence to establish fraud. See id. Fraud may be inferred from "any conduct, the likely effect of which would be to mislead or to conceal." Spies v. United States, 317 U.S. 492, 499 (1943).

John engaged in much conduct that was likely to mislead or conceal. He engaged in a consistent pattern of underreporting income. See Holland v. United States, 348 U.S. 121, 137 (1954). He diverted corporate funds for his own use and concealed the diversion from his brother, the other 50-percent shareholder of

the corporation. See United States v. Thetford, 676 F.2d 170, 175 (5th Cir. 1982). When arranging the sales with Dix Scrap, he asked that he be paid in cash, and he did not ask for any record of the sales to be sent to Simco. See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. He failed to maintain the records of the sales; i.e., the weight tickets. See Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603. He failed to inform Mr. Boyer, his return preparer, about the income from the scrap metal sales until after he learned that Dix Scrap was being audited by the IRS. See Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. per curiam T.C. Memo. 1985-63. The transactions in which the foregoing occurred were not isolated but extensive. There were 229 separate transactions over a period of 2-½ years. Based on all the facts and circumstances, we find that John committed fraud in each year in issue in connection with his failure to report the income from the scrap metal sales.

Fraud of Simco

A corporation can act only through its officers and agents. See Botwinik Bros. of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963). Thus, the only way Simco would be liable for fraud is if its officers or agents engaged in some fraudulent acts. In arguing that Simco is liable for fraud, respondent relies largely

on the actions of John.  Respondent also contends, however, that Neal's actions were likewise fraudulent, claiming on brief that Neal "actively participated in the concealment of John's scheme to divert corporate funds".  Accordingly, we must consider whether Neal's actions were fraudulent and attributable to Simco.

Although respondent's charges against Neal are somewhat scattershot, as best we can assemble them the specifics of Neal's "active * * * [participation] in the concealment of John's scheme" are:  first, Neal's participation in the decision to treat the diverted proceeds, after the fact, as compensation to John and to file amended corporate returns on that basis; second, Neal's testimony at trial concerning an audit interview with respondent's agents relating to the transfer of materials between Simco facilities, which is at a variance with the agents' contemporaneous notes; and third, certain other improbable trial testimony of Neal's concerning who first raised the issue of scrap metal sales at the August 1992 shareholders' meeting.

We first note our finding that Neal was unaware of the diversion of corporate funds until August 1992.  The evidence in the record strongly supports this conclusion, and it is entirely plausible.  John, who the parties agree had a problem with alcohol abuse at the time, was effectively stealing from Neal when he diverted the scrap metal proceeds, and it is not surprising that he hid his activities from Neal and others at

Simco.  Any assessment of Neal's actions, therefore, begins with his learning of John's diversions in August 1992.  Neal's participation in the decision to treat the diverted funds as compensation and to file amended corporate returns on that basis was not fraudulent, certainly not without a showing that Neal was aware that claiming compensation deductions in these circumstances was erroneous.  Respondent has not produced such evidence; rather, the evidence shows that Neal was acting on the advice of Simco's accountant.  Cf. King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. at 517 ("We have a strong suspicion that * * * [the taxpayer] took the deduction knowing that there was a substantial question as to the validity of that action.  But suspicion of fraud is not enough.").  While we do not doubt that Neal's actions in filing the amended corporate returns were also influenced by the knowledge that the audit of Dix Scrap was likely to produce IRS scrutiny of Simco, this motivation does not change our conclusion.  The amended returns, although claiming erroneous deductions, substantially disclosed the diverted income.[9]

_____

[9] In King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511 (1992), the taxpayer filed an original return that failed to report certain income and then filed an amended return that reported the income but claimed offsetting compensation deductions, similar to the instant case.  However, in King's Court Mobile Home Park, Inc., the amended return was filed within the time required to file a return, so the amended return took

(continued...)

As to respondent's contention that Neal gave false testimony at trial concerning an audit interview with respondent's agents, this claim rests on conflicting testimony. One of the agent's notes of the interview recorded that John said he followed a procedure for ensuring that the weight tickets that reflected the scrap metal sales were forwarded from his work location in the Prospect building to the main office in the Buchanan building. At trial, both John and Neal denied that John had made the statements recorded in the notes, while both agents gave contradicting testimony. The agent's notes are not in evidence, although John and Neal obtained the notes and reviewed them just prior to trial. On this record, respondent has failed to prove, by clear and convincing evidence, that Neal gave false testimony at trial.

Finally, while we agree with respondent that Neal's testimony alluding to the possibility that he himself may have been the one who first raised the issue of scrap metal sales is highly improbable, we do not believe this is a material factor in light of the actions taken by Neal to disclose the diverted income on Simco's amended returns.

---

[9](...continued)
the place of the original return. Thus, the question was whether the deductions were claimed fraudulently, not whether the income was omitted fraudulently. In the instant case, the amended returns were not filed within the time required for filing returns, so they do not take the place of the original returns.

For the foregoing reasons, we do not believe that respondent has shown by clear and convincing evidence that Neal's actions provide a basis for attributing fraud to Simco. If Simco has committed fraud, it can only be because John's actions are attributable to it.

Simco filed amended tax returns for each of the fiscal years 1989 and 1990 showing increases in tax owed, effectively conceding that there was an underpayment in each year. Thus, the issue is whether Simco acted with fraudulent intent. See sec. 6663(a). In deciding this issue, the pertinent questions are: (1) Whether the wrongdoing officer or agent had sufficient control of the corporation that his fraudulent acts should be imputed to the corporation, and (2) whether the wrongdoer was acting in behalf of, and not against the interests of, the corporation. See Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502, 506 (10th Cir. 1973), affg. in part and remanding in part on another ground T.C. Memo. 1971-194; Botwinik Bros. of Mass., Inc. v. Commissioner, 39 T.C. at 996; Federbush v. Commissioner, 34 T.C. 740, 750 (1960), affd. per curiam 325 F.2d 1 (2d Cir. 1963); Moore v. Commissioner, T.C. Memo. 1977-275, affd. 619 F.2d 619 (6th Cir. 1980). In the instant case, John, the wrongdoer, was not the sole stockholder. Cf. Federbush v. Commissioner, supra. He did not so dominate the corporation that it was a creature of his will. Cf. Frankland

Racing Equip., Inc. v. Commissioner, T.C. Memo. 1987-210.  If anything, Neal, the president of Simco, was more dominant than John.  Thus, John did not have sufficient control of Simco to impute his acts to Simco on that basis, and we proceed to consider whether John was acting in behalf of, and not against the interests of, Simco.  See Botwinik Bros. of Mass., Inc. v. Commissioner, supra at 996.

We find that the wrongdoer, John, acted against the interests of Simco.  He diverted proceeds for his own use that belonged to Simco.  Simco did not benefit from the sales of scrap metal, except for the incidental tax benefit resulting from the fact that Simco did not report the income from the sales, but it did suffer a detriment in the form of the revenue taken by John.  The diverted revenue was not money that would otherwise have been available to him as dividends because he was a controlling or dominant shareholder.  See Alexander Shokai, Inc. v. Commissioner, 34 F.3d 1480, 1488 (9th Cir. 1994), affg. T.C. Memo. 1992-41; American Lithofold Corp. v. Commissioner, 55 T.C. 904, 926 (1971).

Petitioners invoke the Court of Appeals for the Third Circuit's opinion in Asphalt Indus., Inc. v. Commissioner, 384 F.2d 229 (3d Cir. 1967), revg. 46 T.C. 622 (1966), and invite us to rely on what has become known as the "'innocent stockholder' defense".  Alexander Shokai, Inc. v. Commissioner, supra at 1489.

We decline petitioners' invitation.  Although we hold that Simco is not liable for fraud, we do so because we find that John was not the dominant shareholder of Simco and was not acting in behalf of Simco when he sold scrap metal that belonged to the corporation, retained the proceeds, and failed to disclose the income to the corporation, its other shareholder and advisers, or the IRS.

Accuracy-Related Penalty With Respect to Simco

In the alternative to fraud, respondent determined that Simco was liable for the accuracy-related penalty under section 6662(a) and (b)(1).  Respondent's determinations are presumed correct, and petitioners bear the burden of proving that the penalty does not apply.  See Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Section 6662(a) imposes a penalty in an amount equal to 20 percent of the portion of an underpayment of tax attributable to negligence or disregard of rules or regulations.  See sec. 6662(b)(1).  The term "negligence" includes a failure to make a reasonable attempt to comply with the provisions of the Internal Revenue laws, and "disregard" includes any careless, reckless, or intentional disregard of rules or regulations.  See sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs.

The penalty for negligence or disregard of rules or regulations is inapplicable, however, to any portion of the

underpayment for which the taxpayer can show that he acted in good faith and had reasonable cause.  See sec. 6664(c)(1).  The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the relevant facts and circumstances.  See sec. 1.6664-4(b)(1), Income Tax Regs.  "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer."  Id.  In addition, "Reliance on * * * professional advice * * * constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith".  Id.

In determining whether a corporation is liable for the accuracy-related penalty, the acts of officers on behalf of the corporation are imputed to the corporation.  See O.S.C. & Associates, Inc. v. Commissioner, T.C. Memo. 1997-300; Ibabao Med. Corp. v. Commissioner, T.C. Memo. 1988-285.  As we have already held, John did not act in behalf of Simco, so his acts are not imputed to Simco.  Thus, respondent's determination of Simco's negligence or disregard of rules or regulations depends on a finding of negligence or disregard of rules or regulations on the part of Neal.  As we have also found, John concealed the

fact of the scrap metal proceeds from Neal.  Thus, Neal had an "honest misunderstanding of fact", sec. 1.6664-4(b)(1), Income Tax Regs., that Simco was reporting all of its income.  This misunderstanding was certainly reasonable in light of the fact that Neal had no "knowledge" about the scrap metal sales until August of 1992, after Simco's original returns were filed.  See sec. 1.6664-4(b)(1), Income Tax Regs.  Moreover, in filing Simco's amended returns, Neal relied upon the advice of the company's accountant.  Such reliance was reasonable and in good faith.  See id.; sec. 1.6664-4(c), Income Tax Regs.  Therefore, imputing Neal's acts to Simco, we hold that Simco is not liable for accuracy-related penalties.

To reflect the foregoing,

<u>Decision will be entered for</u> <u>respondent with respect to the</u> <u>deficiencies and for petitioner</u> <u>with respect to the penalties in</u> <u>docket No. 1730-96</u>.

<u>Decision will be entered for</u> <u>respondent in docket No.</u> <u>1731-96</u>.